# EXHIBIT 1

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**Electronically FILED by Superior Court of California, County of Los Angeles 5/02/2025 5:27 PM David W. Slayton, Executive Officer/Clerk of Court, By E. Galicia, Deputy Clerk**

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
WICKED FOODS, INC., a.k.a. WICKED KITCHEN, INC., a Minnesota corporation; Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

OVERHILL FARMS, INC., a Nevada corporation

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk Courthouse
111 N. Spring Street, Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
25STCV12952

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Anita P. Wu (SBN 248876); Brown, Neri, Smith & Khan LLP, 11601 Wilshire Blvd., Ste. 2080, Los Angeles, CA 90025, (310) 935-3947

DATE: David W. Slayton, Executive Officer/Clerk of Court
*(Fecha)* 05/02/2025 Clerk, by *(Secretario)* E. Galicia , Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: WICKED FOODS, INC., a.k.a. WICKED KITCHEN, INC., a Minnesota corporation
   under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

SUM-200(A)

| SHORT TITLE: Overhill Farms, Inc. v. Wicked Foods, Inc. et. al | CASE NUMBER: 25STCV12952 |
| --- | --- |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff ☒ Defendant ☐ Cross-Complainant ☐ Cross-Defendant

AHIMSA COMPANIES LLC, a Colorado limited liability company; PLANT FOODS CO. PBC, a Delaware benefit corporation; and DOES 1 through 10, inclusive

**BROWN NERI SMITH & KHAN LLP**
Anita P. Wu (SBN 248876)
Jackie K.M. Levien (SBN 301239)
Ethan J. Brown (SBN 218814)
11601 Wilshire Blvd., Suite 2080
Los Angeles, California 90025
Tel: 310.935.3947
Fax: 310.593.9980
ANITA.WU@BNSKLAW.COM
JACKIE@BNSKLAW.COM

Attorneys for Plaintiff
OVERHILL FARMS, INC.

**Electronically FILED by Superior Court of California, County of Los Angeles 5/02/2025 5:27 PM David W. Slayton, Executive Officer/Clerk of Court, By E. Galicia, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

OVERHILL FARMS, INC., a Nevada corporation,

Plaintiff,

v.

WICKED FOODS, INC., a.k.a. WICKED KITCHEN, INC., a Minnesota corporation; AHIMSA COMPANIES LLC, a Colorado limited liability company; PLANT FOODS CO. PBC, a Delaware benefit corporation; and DOES 1 through 10, inclusive,

Defendants.

CASE NO.: 25STCV12952

**COMPLAINT FOR:**

1. **BREACH OF CONTRACT;**
2. **BREACH OF CONVENANT OF GOOD FAITH AND FAIR DEALING;**
3. **SUCCESSOR LIABILITY FOR BREACH OF CONTRACT;**
4. **FRAUDULENT TRANSFER;**
5. **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS;**
6. **INTENTIONAL MISREPRESENTATION;**
7. **NEGLIGENT MISREPRESENTATION;**
8. **CONVERSION;**
9. **CIVIL CONSPIRACY TO COMMIT FRAUD;**
10. **UNJUST ENRICHMENT;**
11. **DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiff Overhill Farms, Inc. ("Plaintiff" or "Overhill"), by and through its attorneys, alleges as follows:

## I. INTRODUCTION

1. This action arises from Defendants' failure to pay for goods manufactured and delivered under a valid contract, followed by a deliberate scheme to evade liability by transferring assets from Wicked Foods, Inc. a.k.a. Wicked Kitchen, Inc. ("Wicked") to Ahimsa Companies LLC ("Ahimsa") and/or Plant Foods Co. PBC ("Plant Foods") (collectively, "Defendants") in an improper and fraudulent transaction designed to leave Wicked a shell entity by transferring Wicked's assets to Defendants, continuing Wicked's business operations, and assuming Wicked's customer relationships and branding, all while disclaiming liability for Wicked's debts.

2. Plaintiff Overhill Farms, Inc. ("Overhill") seeks to recover $941,359.72 in unpaid invoices and costs, plus storage fees exceeding $50,000 as of April 2025, interest, attorneys' fees, and equitable relief, including an order voiding the fraudulent transfer of Wicked's assets and/or holding Ahimsa and Plant Foods liable for Wicked's obligations.

## II. PARTIES

3. Plaintiff Overhill Farms, Inc. is a Nevada corporation with its principal place of business in Vernon, California. Overhill is a well-established manufacturer of frozen food products and was engaged by Wicked to produce its branded frozen food line.

4. Defendant Wicked Foods, Inc. a.k.a. Wicked Kitchen, Inc. ("Wicked") is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Wicked contracted with Overhill for the manufacture and supply of its frozen food products but failed to pay for delivered and ordered goods.

5. On information and belief, Defendant Ahimsa Companies LLC ("Ahimsa") is a Colorado Limited Liability Company with its principal place of business in Niwot, Colorado, that acquired substantially all of Wicked's assets, continued Wicked's business operations, and assumed its customer relationships, branding and product lines, while purporting to disclaim liability for Wicked's debts. Despite its status as a Colorado Limited Liability Company, Ahimsa holds itself out as a private equity firm, "group," and "collection" of companies that, on

information and belief, operates and invests in various states, including California, and that targets California companies for investment and/or acquisition.

6. On information and belief, Defendant Plant Foods Co. PBC ("Plant Foods") is a Delaware Benefit Corporation with its principal place of business in Niwot, Colorado, that, together or in association with Ahimsa, acquired substantially all of Wicked's assets, continued Wicked's business operations, and assumed its customer relationships and branding, while purporting to disclaim liability for Wicked's debts. Because Wicked (as explained in more detail below), represented to Overhill on May 29, 2024 that Wicked was "acquired by the Ahimsa Company" and that "[i]n this transaction the brand will no[] longer be under Wicked Foods Inc and it will be part of a new company called Plant Foods," Overhill alleges that Ahimsa and/or Plant Foods, either separately or in association, acquired Wicked's assets, continued Wicked's business operations, and assumed its customer relationships and branding, while purporting to disclaim liability for Wicked's debts.

7. On information and belief, and in light of the representations of Wicked, Plant Foods, and Ahimsa regarding Defendants' partnership, the overlapping authority by and between Defendants and their principals, and the nature of the transaction at the heart of this case, Overhill alleges that there is a unity of interest and ownership between and among Wicked, Plant Foods, and Ahimsa such that it would be unfair for the acts of any one Defendant in this action to be treated as those of that Defendant alone. Defendants are alter egos of each other and their identities are coextensive for purposes of this Complaint, including, without limitation, Overhill's contractual relationships with Defendants and the jurisdictional agreements set forth thereunder. Plant Foods and Ahimsa share a corporate address (which is the residential address of a shared corporate officer, Shaleen Shah, located at 7522 Monarch Road, Niwot, Colorado 80503), and Defendants have overlapping officers and/or managing agents. Defendants have failed to observe corporate formalities by comingling corporate funds, taking title to assets in each other's names, using each other's funds for their operating and other expenses, and then purporting to disclaim responsibility for Wicked's liabilities.

8. DOES 1 through 10 are additional persons or entities whose identities are presently unknown. Overhill will amend this complaint to add them as necessary.

## III. JURISDICTION AND VENUE

9. This Court has jurisdiction under California Code of Civil Procedure § 410.10 because Defendants have conducted business in California, engaged in transactions with Overhill in California, and purposefully directed their activities toward California. For its part, Wicked sells products in California and entered into contracts (including, without limitation, the Manufacturing and Supply Agreement entered into between Wicked and Overhill on or about October 3, 2023) in California that required performance in California (as did Defendants Plant Foods and Ahimsa). Additionally, Defendants Plant Foods and Ahimsa are alter egos of each other and of Wicked, as well as the successors to Wicked's liabilities under the Manufacturing and Supply Agreement entered into between Wicked and Overhill on or about October 3, 2023, pursuant to which all Defendants agree to submit to the jurisdiction of the courts of the State of California. Moreover, Plant Foods and Ahimsa are subject to this Court's jurisdiction because, on information and belief, they control Wicked's business plans, finances, and operations; they share common ownership and managerial functions; they exercise day-to-day control over Wicked's activities; they sell Wicked's products (which themselves are manufactured in California by California companies) in California; and they conduct other business in California. Ahimsa has purposefully directed its activities at California by purchasing other California-based companies, such as Simulate, and by acquiring Wicked, which uses other California-based suppliers in addition to Overhill, such as Beyond Meat. Plant Foods and Ahimsa caused Wicked to continue to purposefully direct its activities at California by receiving and selling California-manufactured inventory in California and entering into California-based contracts. The unity of interest, ownership, and control renders Wicked a mere instrumentality of Plant Foods and Ahimsa, such that failure to disregard their separate identities would result in fraud and injustice, including with respect to jurisdiction.

10. Venue is proper in Los Angeles County under California Code of Civil Procedure §§ 395(a) and 395.5 because the contract giving rise to this action was made and was to be performed in Los Angeles County, California, the obligation or liability giving rise to this action

arose in Los Angeles County, California, and the breach thereof occurred in Los Angeles County, California. Under the Manufacturing and Supply Agreement entered into between Wicked and Overhill on or about October 3, 2023, to which all Defendants are subject, Defendants agree that venue is proper in the courts of the State of California located in Los Angeles, California.

## IV. FACTUAL ALLEGATIONS

### A. The Manufacturing and Supply Agreement

11. On or about October 3, 2023, Overhill and Wicked[1] entered into a written Manufacturing and Supply Agreement (the "Agreement"), pursuant to which Overhill agreed to manufacture and supply custom frozen food products for Wicked, which Wicked would then provide to its retail and food service customers. A true and correct copy of the Agreement is attached hereto as **Exhibit A.**

12. Under Section 4.2 of the Agreement, Wicked was required to pay all invoices within thirty (30) days of issuance.

13. Between March and April 2024, Wicked issued Purchase Order Nos. #PO-01717, #PO-01717-1, #PO-01717-2, #PO-01717-3, #PO-01717-4, and #PO-01717-5 (the "Purchase Orders") to Overhill, which ordered nearly $450,000 in Overhill products. True and correct copies of the Purchase Orders are attached hereto as **Exhibit B**.

14. Overhill accepted the Purchase Orders and manufactured and delivered products thereunder, which after invoicing totaled $449,104.62. Wicked accepted the products, but has failed to make payment therefore. Pursuant to Invoice Nos. 40110, 40111, 40176, 40274, 40275, and 40290, which Overhill issued in response to Wicked's Purchase Orders, Wicked owes Overhill an unpaid principal balance of $449,104.62, which balance has been outstanding since May 2024. True and correct copies of the Invoices are attached hereto as **Exhibit C**.

15. Overhill also produced custom inventory at Wicked's request pursuant to Section 5.2 of the Agreement, valued at $436,774.38, which Wicked abandoned without payment. Aside from the amounts owed for the inventory, Wicked owes Overhill storage fees in the amount of $9

---

[1] The Manufacturing and Supply Agreement variously refers to Wicked as "Wicked Kitchen Inc." and "Wicked Foods Inc." *See* Exhibit A at 1, 9.

per pallet for each full or partial month of storage required for the inventory pursuant to Section 6.1 of the Agreement, which currently exceeds $50,000 as of April 2025 and continues to accrue. Wicked also owes Overhill $55,480.72 for unique ingredients and packaging purchased by Overhill on Wicked's behalf pursuant to Section 7.1 of the Agreement.

16. Section 5.2 of the Agreement provides:

> Forecasts. Customer agrees to provide Overhill with a rolling thirteen (13) week forecast, updated on a weekly basis, of its anticipated Product purchases (the "Forecast"). The most current four (4) weeks of such Forecasts will constitute binding purchase orders, and the remaining six (9) weeks will not constitute binding purchase orders but Overhill shall be entitled to rely upon the entirety of the thirteen (13) week Forecasts when ordering Materials as further provided herein.

*See* Exhibit A at 3.

17. Section 6.1 of the Agreement provides:

> All Product shall be made available for pick up by Customer or by Customer's third party freight carriers F.O.B. Overhill's designated distribution facilities. Customer agrees to pick up the Products within seventy two (72) hours of notification by Overhill. If Customer fails to pick up the Products within such time period, Customer will be charged $9.00 per pallet for each full or partial month of storage required.

*See* Exhibit A at 3.

18. Section 7.1 of the Agreement provides:

> Purchase of Materials. Overhill agrees to procure sufficient inventories of materials and packaging ("Materials") necessary to manufacture and package Products in accordance with the Binding Orders. For Materials having a lead time greater than four (4) weeks or requiring a minimum quantity greater than needed to fulfill the Binding Orders, the parties agree that Overhill shall purchase such Materials based upon the thirteen (13) week Forecast or such minimum orders and/or lead time required by the Material vendor. For any Materials requiring an annual or seasonal commitment by Overhill in order to lock in pricing, including but not limited to poultry and vegetables, Overhill shall be entitled to rely upon the Annual Volume Commitment in making its commitment to the Materials vendor. With respect to the purchase of paperboard, the parties agree that Overhill shall purchase such paperboard approximately four (4) months in advance in accordance with the most current four (4) months of the Forecast. In the event there are any unused Materials that were purchased by Overhill in reliance on the Binding Orders, the Forecasts, the Annual Volume Commitment, or pursuant to minimum quantities or lead times set forth above, Customer shall promptly reimburse Overhill for the actual cost of all such unused Materials, whether due to Product discontinuance, change in

> Specifications, termination of the Agreement, or for any reason(s) or circumstance(s) not caused by Overhill.

*See* Exhibit A at 3.

19. Section 20(a) of the Agreement provides:

> Neither party may assign or transfer this Agreement without the written consent of the other party, which shall not be unreasonably withheld. However, in the event that (i) any person or entity, directly or indirectly, acquires ownership or control of 49% or more of the voting securities or ownership interests of either party hereto; or (ii) either party is merged with or into another entity, resulting in the loss of control over its business and affairs (each such event being a "Change In Control"), no written consent shall be required from the other party for assigning the agreement conditioned advance written notice of at least fifteen (15) days being provided to the other party. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

*See* Exhibit A at 8.

20. As set forth in more detail below, Overhill made repeated demands for payment from Wicked's representatives beginning in May 2024. However, although Wicked initially represented that payment was forthcoming, to date, Wicked still has failed and refused to pay the outstanding sums owed to Overhill.

21. On information and belief, Wicked issued the Purchase Orders and ordered other inventory from Overhill knowing that it was presently or imminently engaged in a transaction with Plant Foods and/or Ahimsa that was designed to allow Wicked (and eventually Plant Foods and Ahimsa) to continue to receive benefits under the Agreement (i.e., Overhill-manufactured products) without paying for those products.

**B. Overhill Undertook Exhaustive Efforts to Secure Payment Under the Agreement—and Defendants Stonewalled**

22. On May 29, 2024, Wicked's Supply Chain Director, Orlando Villegas, informed Overhill: "[T]he Wicked Kitchen brand has been acquired by the Ahimsa Company. In this transaction the brand will no longer be under Wicked Foods Inc. and it will be part of a new company called Plant Foods." Mr. Villegas purported to provide an address for the new company, which he identified as "Plant Foods Co PBC" with EIN 99-1571674. He stated, "We would like to

schedule a meeting as soon as it is convenient for you to answer any questions. I imagine there are some things we would need to change, let us know how to proceed." Importantly, to the extent this communication constituted notice of the transaction, it violates Section 20(a) of the Agreement—which provides, nevertheless, that "[t]his Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns."

23. Over the course of the next few months, Overhill repeatedly asked Wicked and Ahimsa representatives to discuss the changes. Overhill also made repeated inquiries about the status of Wicked's past due payments, and repeatedly asked Wicked for confirmation that the outstanding payment was in process. This includes but is not limited to Overhill's written correspondence dated May 30, 31; June 5, 6, 10, 14, 21, 25, 27; and July 2, 3, 9, 10, 15, 22, 24 and 31. Overhill was explicit about the urgency in needing to resolve these matters. For example, it wrote: "We need to get this paid. We also have inventory on-hand that is the same amount that needs to be picked up. Who do we need to talk to to get this paid as this invoice is severely past-due. Please tell us who we can talk with to resolve this." At one point, Overhill's Miriam Ruiz (Accounts Receivable) simply wrote: "Where are you? Please help me."

24. Overhill's inquiries were either ignored altogether, or met with false promises that Wicked was getting the overdue payment approved by its "new leadership" and that payment would be sent shortly. For example:

- On June 3, 2024, Wicked's Financial Controller (now Ahimsa's Financial Controller), Paulina Gorszewski, wrote: "Apologies for the delay, we are working on an internal transition and I will get these entered and send a payment out. Thank you for your patience!!"
- On June 11, 2024, Wicked's Supply Chain Director, Orlando Villegas, responded: "I'll follow up today and let you know."
- On June 18, 2024, Mr. Villegas wrote: "[W]ith the changes we just went through there was a change in leadership with Pete not being the CEO anymore. I am working with the new leadership to get this approved."

- On June 24, 2024, Mr. Villegas wrote: "I was promised an answer today, Miriam. I am very sorry this is taking this long."
- When Overhill still received no response and was forced to reach out again, Mr. Villegas wrote on June 28, 2024: "Sorry Miriam, I took a off day yesterday. Let me call some people right away to get an answer."

25. On July 9, 2024, Overhill informed Wicked that it had unsuccessfully tried to overnight copies of past due invoices to the address that Wicked had provided for the new company "Plant Foods Co." Overhill requested a physical address or email. In response, on July 10, 2024, Mr. Villegas informed Overhill: "I don't have another address" and simply directed Overhill to contact Wicked's Controller, Paulina Gorszewski—who had been unresponsive (and is now an Ahimsa officer, director, or managing agent).

26. On July 10, 2024, Overhill again repeated its concerns about Wicked's delays, stating: "[W]e are very concerned about the lack of communication and continuing delay in receiving payment. . . We understand after an acquisition there are typically short-term delays, usually involving a change in banking relations. However, it is now approaching 60 days past due without a confirmation as to when we can expect payment. Please respond as possible as of when we will receive payment." In addition, Overhill asked Wicked to complete a credit application for Plant Foods, Co.

27. On July 15, 2024, Wicked informed Overhill that Ahimsa's CEO, Matt Tullman, would like to set up a meeting with Overhill representatives to discuss. Overhill responded the same day with available times for the proposed meeting, and Wicked stated the next day that a calendar invite would be sent "shortly." However, Ahimsa's Chief of Staff, Isabelle Caputo, informed Overhill: "We're working on finalizing some information and Matt wants a full picture before we review and discuss. I'll be in touch as soon as I can to book the call."

28. On July 22, 2024, Overhill sent a "Final Demand Letter" to Wicked. A true and correct copy is attached hereto as **Exhibit D**.

29. On July 24, 2024, Overhill again sent Wicked and Ahimsa documentation of the aging inventory and unpaid invoices, again asking: "Please let us know if we are going to connect

to discuss. Also, please tell Matt Tullman we would like to better understand his intentions as your CEO in resolving this matter." In a further email to Wicked and Ahimsa the same day, Overhill reiterated: "As you are aware Overhill Farms sent you a final demand letter for payment for the inventory that you have received for the full amount of $449,104.62 to be paid by July 31st. . . In addition to the receivables there is an additional $436,774.38 of inventory that needs to be pre-paid and picked up. This is part of the contract agreement for the forecast which constitutes binding purchase orders. You will also be charged for storage of $9 per pallet for each full or partial month for storage of this inventory. You have unique ingredients and packaging that was purchased on your behalf in the amount of [$55,480.72]."

30. On August 1, 2024, Overhill received a letter from counsel for Ahimsa, Blue Dot Advocates, in response to its demands. Incredibly, Ahimsa's attorney demanded that Overhill cease all attempts to collect obligations owed by Wicked, and further demanded that it "cease and desist any defamatory or libelous actions regarding Ahimsa, any members of the Ahimsa Group, and any employee, officer, owner, director, manager, consultant, or agent thereof," under threat of legal action against Overhill for "all legal remedies, monetary and nonmonetary damages, injunctive relief, and attorneys' fees and costs." Ahimsa cautioned that "Overhill could face significant liability and exposure under such legal action."

31. Forced to retain counsel to investigate and pursue Overhill's claims for the losses and damages suffered by Overhill as a result of Wicked's failure and refusal to honor its unambiguous contractual obligations, on November 19, 2024, Overhill made a formal mediation demand to Wicked under Section 20(e) of the parties' Agreement, through Overhill's counsel at Brown Neri Smith & Khan LLP. The letter detailed Overhill's attempts to address these matters with both Wicked and the Ahimsa Group, insofar as Wicked had represented to Overhill that it had been acquired by Ahimsa, was under Ahimsa's new ownership and leadership, and that payment of its overdue balances would need to be approved by its new leadership at Ahimsa. A true and correct copy of Overhill's November 19, 2024 letter is attached hereto as **Exhibit E.** Overhill requested that the letter be promptly forwarded to any and all representatives of Wicked and/or other associated entities whose involvement may be necessary to fully resolve the matter.

32. In response, on November 24, 2024, counsel for Plant Foods and Ahimsa represented in writing that Plant Foods acquired "certain" of Wicked's assets but it "did not acquire Wicked" or assume Wicked's contractual liabilities to Overhill—a representation that contradicted, among other things, Wicked's public statements, Wicked's representations to Overhill that payment of the overdue sums was subject to approval by its new Ahimsa leadership and would be forthcoming upon receipt of such approval, and Wicked's May 29, 2024 representation to Overhill that Wicked was "acquired by the Ahimsa Company. In this transaction the brand will not [sic] longer be under Wicked Foods Inc and it will be part of a new company called Plant Foods."

33. On November 24, 2024, Craig Jalbert informed Overhill's counsel that he was the sole remaining officer and director of Wicked, appointed "solely for the purpose of effectuating a wind-down of the Company's business affairs." According to Mr. Jalbert, Wicked "was no longer able to financially sustain itself" and "entered into a negotiated sale of substantially all of its assets in lieu of foreclosure with its senior secured creditor." He rejected Overhill's demands for payment (and mediation), stating: "[N]o funds will be available to distribute to any unsecured general creditors or investors. The year of loss is 2023. There will be no other notice." Mr. Jalbert failed and refused to respond to Overhill's further efforts to discuss these matters, including Overhill's correspondence dated January 31, 2025, which requested additional information about Wicked's acquisition and/or sale of its assets. A true and correct copy of Overhill's January 31, 2025 letter is attached hereto as **Exhibit F**.

### C. Wicked's Transfer of Assets to Plant Foods and/or Ahimsa

34. On information and belief, in or around May or June 2024, Wicked transferred substantially all of its assets, including its intellectual property, customer accounts, inventory, and brand operations, to Plant Foods and/or Ahimsa in a transaction described by Ahimsa's counsel as a "sale in lieu of foreclosure."

35. According to Ahimsa's counsel, Ahimsa and/or Plant Foods acquired most of Wicked's assets (including the "Wicked Kitchen" trademark, and the Wicked Kitchen email domain), and "prior Wicked Foods employees or consultants were hired or engaged" – but

nonetheless, Ahimsa and Plant Foods claim that "[t]he company Wicked Foods remains a free-standing legal entity, and neither it nor its obligations to Overhill were acquired by the Ahimsa Group."

36. However, publicly, Wicked and Ahimsa (via Ahimsa's CEO, Matt Tullman) issued public statements reported by countless news sources, indicating that Wicked had "joined" and been "acquired by" the newly formed Ahimsa Companies, for an undisclosed sum. One source reported: "Wicked is now a subsidiary of Ahimsa Companies, Tullman said." The announcements made no mention of any association with Plant Foods or financial distress on Wicked's part. For example, on June 17, 2024, Wicked's website stated: "Wicked Kitchen, along with Good Catch and Current Foods, has joined the Ahimsa Companies! . . . This collaboration allows us to expand to more retailers, enhance food service offerings, and invest in innovation. With Ahimsa, we are ready to scale new heights and shape the future of the plant-based industry!"[2] Wicked's website also linked to more than a dozen additional articles stating that Wicked was "acquired" or "bought" by Ahimsa. News sources likened the acquisition to a recapitalization. Wicked's CEO, Pete Speranza, announced: "Wicked Kitchen is proud to join the Ahimsa Companies. We are aligned in our mission, and we believe that Wicked Kitchen is stronger today and better positioned to serve the health and environmentally conscious consumer."

37. When asked "[i]s the management team at Wicked Kitchen staying in place leading its further development," Ahimsa's CEO publicly stated: "So far, we've been able to maintain 100% of the positions to today . . . [A]s of today, everyone is still in their seat."[3] News sources further reported that, according to Ahimsa's CEO, all of Wicked's prior shareholders "have carried over to Wicked 2.0," and that "[a]though the company is new to the scene, the people behind it are not, especially to Wicked."

---

[2] https://wickedkitchen.com/wicked-kitchen-joins-ahimsa-companies/ (Wicked's website linking to more than a dozen articles stating Wicked was "acquired" or "bought" by Ahimsa).

[3] https://www.just-food.com/interviews/weve-got-to-step-up-and-help-these-companies-get-to-that-next-level-new-investor-ahimsa-companies-on-backing-plant-based/

38. Plaintiff is informed and believes, and thereupon alleges, that this transaction was not an arm's-length sale but an orchestrated move and fraudulent transaction to allow Wicked's business to continue under Defendants' control while evading liability for Wicked's debts.

39. Defendants continued selling the same Wicked-branded products using Overhill-manufactured inventory, employing the same key personnel as Wicked, and engaging with the same customer base as Wicked.

40. On information and belief, Defendants received the proceeds from the transaction, and Wicked was left as a shell entity unable to pay creditors like Overhill—even though Wicked-branded products using Overhill-manufactured inventory continue to appear on retail shelves. For example, as recently as December 21, 2024, Overhill's Vice President, Laura Love, witnessed and photographed Wicked-branded products using Overhill-manufactured inventory for sale at Target in Torrance, California. True and correct copies of photographs of the products taken by Ms. Love are attached hereto as **Exhibit G.**

41. Defendants played a central role in the asset transfer, controlling or structuring the transaction in a manner that facilitated the continuation of Wicked's operations and ensured that Defendants received valuable assets while Wicked's creditors were left unpaid.

42. Defendants benefited from the transaction by receiving valuable assets and ownership or control over the restructured business while disclaiming liability.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT

### (Against All Defendants)

43. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

44. On or about October 3, 2023, Overhill and Wicked entered into the Agreement, under which Overhill agreed to manufacture and supply custom frozen food products for Wicked, which Wicked would then provide to its retail and food service customers. The Agreement is valid and binding in all respect and supported by sufficient consideration.

45. Under Section 4.2 of the Agreement, Wicked was required to pay all invoices within thirty (30) days of issuance.

46. Between March and April 2024, Wicked issued the Purchase Orders to Overhill, which ordered nearly $450,000 in Overhill products. Overhill accepted the Purchase Orders and manufactured and delivered products thereunder, which after invoicing totaled $449,104.62. Wicked accepted the products, but has failed to make payment therefore. Pursuant to Invoice Nos. 40110, 40111, 40176, 40274, 40275, and 40290, which Overhill issued in response to Wicked's Purchase Orders, Wicked owes Overhill an unpaid principal balance of $449,104.62, which balance has been outstanding since May 2024.

47. Overhill also produced custom inventory at Wicked's request pursuant to Section 5.2 of the Agreement, valued at $436,774.38, which Wicked abandoned without payment. Aside from the amounts owed for the inventory, Wicked owes Overhill storage fees in the amount of $9 per pallet for each full or partial month of storage required for the inventory pursuant to Section 6.1 of the Agreement, which storage fees exceed $50,000 as of April 2025. Wicked also owes Overhill $55,480.72 for unique ingredients and packaging purchased by Overhill on Wicked's behalf pursuant to Section 7.1 of the Agreement.

48. Overhill has fulfilled all of its obligations under the Agreement.

49. Wicked—the debts of which Plant Foods and Ahimsa are now liable—has failed to pay the aforementioned sums to Overhill, which amounts are due under the Agreement. Wicked is therefore in breach of the Agreement.

50. Overhill has been damaged by Wicked's breach in the amounts stated above.

51. As Wicked's alter egos and successors, Plant Foods and Ahimsa are also liable for Wicked's breach.

**SECOND CAUSE OF ACTION – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against All Defendants)**

52. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

53. On or about October 3, 2023, Overhill and Wicked entered into the Agreement, under which Overhill agreed to manufacture and supply custom frozen food products for Wicked, which Wicked would then provide to its retail and food service customers. The Agreement is valid and binding in all respect and supported by sufficient consideration.

54. Under Section 4.2 of the Agreement, Wicked was required to pay all invoices within thirty (30) days of issuance.

55. Between March and April 2024, Wicked issued the Purchase Orders to Overhill, which ordered nearly $450,000 in Overhill products. Overhill accepted the Purchase Orders and manufactured and delivered products thereunder, which after invoicing totaled $449,104.62. Wicked accepted the products, but has failed to make payment therefore. Pursuant to Invoice Nos. 40110, 40111, 40176, 40274, 40275, and 40290, which Overhill issued in response to Wicked's Purchase Orders, Wicked owes Overhill an unpaid principal balance of $449,104.62, which balance has been outstanding since May 2024.

56. Overhill also produced custom inventory at Wicked's request pursuant to Section 5.2 of the Agreement, valued at $436,774.38, which Wicked abandoned without payment. Aside from the amounts owed for the inventory, Wicked owes Overhill storage fees in the amount of $9 per pallet for each full or partial month of storage required for the inventory pursuant to Section 6.1 of the Agreement, which storage fees exceed $50,000 as of April 2025. Wicked also owes Overhill $55,480.72 for unique ingredients and packaging purchased by Overhill on Wicked's behalf pursuant to Section 7.1 of the Agreement.

57. Overhill has fulfilled all of its obligations under the Agreement.

58. Wicked—the debts of which Plant Foods and Ahimsa are now liable—has failed to pay the aforementioned sums to Overhill, which amounts are due under the Agreement. Wicked is therefore in breach of the Agreement.

59. Wicked's breach has prevented Overhill from receiving the benefits of the Agreement.

60. By its breach, Wicked did not act fairly and in good faith.

61. Overhill has been damaged by Wicked's breach in the amounts stated above.

62. As Wicked's alter egos and successors, Plant Foods and Ahimsa are also liable for Wicked's breach.

**THIRD CAUSE OF ACTION – SUCCESSOR LIABILITY FOR BREACH OF CONTRACT**

**(Against Plant Foods and Ahimsa)**

63. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

64. On or about October 3, 2023, Overhill and Wicked entered into the Agreement, under which Overhill agreed to manufacture and supply custom frozen food products for Wicked, which Wicked would then provide to its retail and food service customers. The Agreement is valid and binding in all respect and supported by sufficient consideration.

65. Under Section 4.2 of the Agreement, Wicked was required to pay all invoices within thirty (30) days of issuance.

66. Between March and April 2024, Wicked issued the Purchase Orders to Overhill, which ordered nearly $450,000 in Overhill products. Overhill accepted the Purchase Orders and manufactured and delivered products thereunder, which after invoicing totaled $449,104.62. Wicked accepted the products, but has failed to make payment therefore. Pursuant to Invoice Nos. 40110, 40111, 40176, 40274, 40275, and 40290, which Overhill issued in response to Wicked's Purchase Orders, Wicked owes Overhill an unpaid principal balance of $449,104.62, which balance has been outstanding since May 2024.

67. Overhill also produced custom inventory at Wicked's request pursuant to Section 5.2 of the Agreement, valued at $436,774.38, which Wicked abandoned without payment. Aside from the amounts owed for the inventory, Wicked owes Overhill storage fees in the amount of $9 per pallet for each full or partial month of storage required for the inventory pursuant to Section 6.1 of the Agreement, which storage fees exceed $50,000 as of April 2025. Wicked also owes Overhill $55,480.72 for unique ingredients and packaging purchased by Overhill on Wicked's behalf pursuant to Section 7.1 of the Agreement.

68. Overhill has fulfilled all of its obligations under the Agreement.

69. Wicked—the debts of which Plant Foods and Ahimsa are now liable for—has failed to pay the aforementioned sums to Overhill, which amounts are due under the Agreement. Wicked is therefore in breach of the Agreement.

70. Overhill has been damaged by Wicked's breach in the amounts stated above.

71. Plant Foods and/or Ahimsa are liable for Wicked's obligations to Overhill under the Agreement because they expressly or impliedly agreed to assume Wicked's liabilities; (2) the transaction pursuant to which Defendants transferred Wicked's assets amounts to a consolidation or merger of Wicked and Defendants; (3) Defendants are operating a mere continuation of Wicked's business; and/or (4) the transfer of Wicked's assets to Defendants was for the fraudulent purpose of escaping liability for Wicked's debts.

72. On information and belief, no adequate consideration was given by Defendants for Wicked's assets and made available for meeting the claims of its unsecured creditors, and/or one or more persons were or are now officers, directors, or stockholders of both Wicked and Defendants. Wicked, Plant Foods, and Ahimsa have not preserved separate identities, and have attempted to leave Wicked's creditors.

73. As Wicked's alter egos and successors, Plant Foods and Ahimsa are also liable for Wicked's obligations under the Agreement.

**FOURTH CAUSE OF ACTION – FRAUDULENT TRANSFER**

**(Against All Defendants)**

74. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

75. Pursuant to the Agreement, and the Purchase Orders issued thereunder, Overhill has a right to payment from Wicked in the amount of $941,359.72, plus storage fees exceeding $50,000 as of April 2025.

76. Through a sham transaction designed to allow Defendants to receive Wicked's valuable assets while leaving Wicked as a shell entity unable to pay creditors like Overhill, Wicked transferred property and/or incurred an obligation to Ahimsa and/or Plant Foods.

77. Wicked did not receive a reasonably equivalent value in exchange for the transfer and/or obligation.

78. Wicked was in business and transacting with Overhill—including issuing the Purchase Orders and receiving inventory—when its remaining assets were unreasonably small for its obligations to Overhill.

79. Overhill was harmed and Defendants' conduct was a substantial factor in causing that harm.

80. Defendants engaged in the conduct alleged herein with malice, fraud and/or oppression as defined in California Civil Code Section 3294, entitling Overhill to punitive damages. Plaintiff is informed and believes, and thereon alleges, that the malice, fraud and/or oppression was undertaken by one or more officers, directors, and/or managing agents of Defendants, acting on Defendants' behalf, and/or the conduct was authorized, adopted and/or approved by Defendants' officers, directors and/or managing agents.

81. The conduct alleged herein constitutes an intentional misrepresentation, deceit, and/or concealment of a material fact known to Defendants with the intention on the part of Defendants of thereby depriving Overhill of property or legal rights or otherwise causing injury. As noted above, misrepresentations regarding Defendants' intentions to pay Overhill, the nature of the relationship between Defendants, and the transaction pursuant to which Plant Foods and/or Ahimsa acquired Wicked's assets and took control of the brand were made by officers, directors and managing agents of Defendants – including Ahimsa's CEO, Matt Tullman – all of whom were responsible for the fraudulent transfer alleged herein. Defendants' conduct was also malicious because it was intended to cause financial injury to Overhill and/or was despicable and carried out with a willful and conscious disregard of Overhill's rights—indeed, Defendants knowingly and intentionally received Overhill-manufactured products without paying for them, restructured Wicked to avoid paying Overhill, and engaged in deceitful and bad faith conduct to injure Overhill when it sought repayment. Defendants' conduct was despicable and subjected Overhill to unjust hardship in knowing disregard of Overhill's rights.

**FIFTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(Against Plant Foods and Ahimsa)**

82. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

83. On or about October 3, 2023, Overhill and Wicked entered into the Agreement, under which Overhill agreed to manufacture and supply custom frozen food products for Wicked, which Wicked would then provide to its retail and food service customers. The Agreement is valid and binding in all respect and supported by sufficient consideration.

84. Under Section 4.2 of the Agreement, Wicked was required to pay all invoices within thirty (30) days of issuance.

85. Between March and April 2024, Wicked issued the Purchase Orders to Overhill, which ordered nearly $450,000 in Overhill products. Overhill accepted the Purchase Orders and manufactured and delivered products thereunder, which after invoicing totaled $449,104.62. Wicked accepted the products, but has failed to make payment therefore. Pursuant to Invoice Nos. 40110, 40111, 40176, 40274, 40275, and 40290, which Overhill issued in response to Wicked's Purchase Orders, Wicked owes Overhill an unpaid principal balance of $449,104.62, which balance has been outstanding since May 2024.

86. Overhill also produced custom inventory at Wicked's request pursuant to Section 5.2 of the Agreement, valued at $436,774.38, which Wicked abandoned without payment. Aside from the amounts owed for the inventory, Wicked owes Overhill storage fees in the amount of $9 per pallet for each full or partial month of storage required for the inventory pursuant to Section 6.1 of the Agreement, which storage fees exceed $50,000 as of April 2025. Wicked also owes Overhill $55,480.72 for unique ingredients and packaging purchased by Overhill on Wicked's behalf pursuant to Section 7.1 of the Agreement.

87. Overhill has fulfilled all of its obligations under the Agreement.

88. Wicked—the debts of which Plant Foods and Ahimsa are now liable—has failed to pay the aforementioned sums to Overhill, which amounts are due under the Agreement. Wicked is therefore in breach of the Agreement.

89. Overhill has been damaged by Wicked's breach in the amounts stated above.

90. Plant Foods and Ahimsa knew of the Agreement between Overhill and Wicked.

91. Plant Foods and Ahimsa prevented Wicked's performance under the Agreement, and/or intended to disrupt Wicked's performance, and/or knew that disruption of performance was certain or substantially certain to occur.

92. Overhill was harmed, and Plant Foods and Ahimsa's conduct was a substantial factor in causing that harm.

## SIXTH CAUSE OF ACTION – INTENTIONAL MISREPRESENTATION

**(Against All Defendants)**

93. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

94. Between May and June 2024, Overhill made repeated inquiries about the status of Wicked's past due payments, and repeatedly asked Wicked for confirmation that the outstanding payment was in process.

95. Overhill's inquiries were met with fraudulent misrepresentations that Wicked was getting the overdue payment approved by its "new leadership" and that payment would be sent shortly. For example:

- On June 3, 2024, Wicked's Financial Controller (now Ahimsa's Financial Controller), Paulina Gorszewski, wrote: "Apologies for the delay, we are working on an internal transition and I will get these entered and send a payment out. Thank you for your patience!!"
- On June 11, 2024, Wicked's Supply Chain Director, Orlando Villegas, responded: "I'll follow up today and let you know."

- On June 18, 2024, Mr. Villegas wrote: "[W]ith the changes we just went through there was a change in leadership with Pete not being the CEO anymore. I am working with the new leadership to get this approved."
- On June 24, 2024, Mr. Villegas wrote: "I was promised an answer today, Miriam. I am very sorry this is taking this long."
- When Overhill still received no response and was forced to reach out again, Mr. Villegas wrote on June 28, 2024: "Sorry Miriam, I took a off day yesterday. Let me call some people right away to get an answer."

96. In addition to the foregoing misrepresentations regarding Wicked's outstanding payments to Overhill, Defendants have repeatedly misrepresented the nature of the transaction by which Defendants purport to have acquired Wicked. On November 24, 2024, counsel for Plant Foods and Ahimsa represented in writing that Plant Foods acquired "certain" of Wicked's assets but it "did not acquire Wicked" or assume Wicked's contractual liabilities to Overhill—a representation that contradicted, among other things, Wicked's public statements, Wicked's representations to Overhill that payment of the overdue sums was subject to approval by its new Ahimsa leadership and would be forthcoming upon receipt of such approval, and Wicked's May 29, 2024 representation to Overhill that Wicked was "acquired by the Ahimsa Company. In this transaction the brand will not [sic] longer be under Wicked Foods Inc and it will be part of a new company called Plant Foods."

97. Defendants knew these representations were false when they made them, or Defendants made these representations recklessly and without regard for their truth. Specifically, Defendants knew in May and June of 2024 that they had no intention of paying the Overhill invoices—indeed, they issued the Purchase Orders and ordered the other inventory knowing that they would never pay for the Overhill product—and misrepresented their intentions to Overhill to string Overhill along. Likewise, Defendants knew the true structure of the acquisition by which Defendants purport to have acquired Wicked, and have falsely misrepresented that structure in different ways and at different times to Overhill and the public when it suits their needs.

98. Defendants intended that Overhill rely on their misrepresentations—indeed, the misrepresentations were made to string Overhill along as Defendants ransacked Wicked to avoid responsibility for its valid contracts.

99. Overhill reasonably relied on Defendants' misrepresentations. Overhill engaged with Defendants in good faith over the course of nearly half a year to secure payment of the outstanding invoices, only to be met with threats by Defendants and a continued refusal to pay, all while Overhill continued to incur storage costs for products ordered by Wicked and while Overhill employees witnessed Wicked inventory using Overhill-manufactured products for sale on retail shelves.

100. Overhill was harmed as a result of Defendants' fraudulent misrepresentations.

101. Overhill's reliance on Defendants' fraudulent misrepresentations was a substantial factor in causing its harm.

102. Defendants engaged in the conduct alleged herein with malice, fraud and/or oppression as defined in California Civil Code Section 3294, entitling Overhill to punitive damages. Plaintiff is informed and believes, and thereon alleges, that the malice, fraud and/or oppression was undertaken by one or more officers, directors, and/or managing agents of Defendants, acting on Defendants' behalf, and/or the conduct was authorized, adopted and/or approved by Defendants' officers, directors and/or managing agents.

103. The conduct alleged herein constitutes an intentional misrepresentation, deceit, and/or concealment of a material fact known to Defendants with the intention on the part of Defendants of thereby depriving Overhill of property or legal rights or otherwise causing injury. As noted above, misrepresentations regarding Defendants' intentions to pay Overhill, the nature of the relationship between Defendants, and the transaction pursuant to which Plant Foods and/or Ahimsa acquired Wicked's assets and took control of the brand were made by officers, directors and managing agents of Defendants – including Ahimsa's CEO, Matt Tullman – all of whom were responsible for the misrepresentations alleged herein. Defendants' conduct was also malicious because it was intended to cause financial injury to Overhill and/or was despicable and carried out with a willful and conscious disregard of Overhill's rights—indeed, Defendants knowingly and

intentionally received Overhill-manufactured products without paying for them, restructured Wicked to avoid paying Overhill, made intentional misrepresentations to Overhill, and engaged in deceitful and bad faith conduct to injure Overhill when it sought repayment. Defendants' conduct was despicable and subjected Overhill to unjust hardship in knowing disregard of Overhill's rights.

**SEVENTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION**

**(Against All Defendants)**

104. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

105. Between May and June 2024, Overhill made repeated inquiries about the status of Wicked's past due payments, and repeatedly asked Wicked for confirmation that the outstanding payment was in process.

106. Overhill's inquiries were met with negligent misrepresentations that Wicked was getting the overdue payment approved by its "new leadership" and that payment would be sent shortly. For example:

- On June 3, 2024, Wicked's Financial Controller (now Ahimsa's Financial Controller), Paulina Gorszewski, wrote: "Apologies for the delay, we are working on an internal transition and I will get these entered and send a payment out. Thank you for your patience!!"
- On June 11, 2024, Wicked's Supply Chain Director, Orlando Villegas, responded: "I'll follow up today and let you know."
- On June 18, 2024, Mr. Villegas wrote: "[W]ith the changes we just went through there was a change in leadership with Pete not being the CEO anymore. I am working with the new leadership to get this approved."
- On June 24, 2024, Mr. Villegas wrote: "I was promised an answer today, Miriam. I am very sorry this is taking this long."

- When Overhill still received no response and was forced to reach out again, Mr. Villegas wrote on June 28, 2024: "Sorry Miriam, I took a off day yesterday. Let me call some people right away to get an answer."

107. In addition to the foregoing misrepresentations regarding Wicked's outstanding payments to Overhill, Defendants have repeatedly misrepresented the nature of the transaction by which Defendants purport to have acquired Wicked. On November 24, 2024, counsel for Plant Foods and Ahimsa represented in writing that Plant Foods acquired "certain" of Wicked's assets but it "did not acquire Wicked" or assume Wicked's contractual liabilities to Overhill—a representation that contradicted, among other things, Wicked's public statements, Wicked's representations to Overhill that payment of the overdue sums was subject to approval by its new Ahimsa leadership and would be forthcoming upon receipt of such approval, and Wicked's May 29, 2024 representation to Overhill that Wicked was "acquired by the Ahimsa Company. In this transaction the brand will not [sic] longer be under Wicked Foods Inc and it will be part of a new company called Plant Foods."

108. Defendants had no reasonable grounds for believing the foregoing representations were true when they made them. Specifically, Defendants knew in May and June of 2024 that they would likely have no ability to pay the Overhill invoices—indeed, they issued the Purchase Orders and ordered the other inventory knowing that they had engaged in a transaction that created an unreasonable risk to their ability to pay for the Overhill product—and misrepresented their intentions to Overhill to string Overhill along. Likewise, Defendants knew the true structure of the acquisition by which Defendants purport to have acquired Wicked, and have negligently misrepresented that structure in different ways and at different times to Overhill and the public when it suits their needs.

109. Defendants intended that Overhill rely on their misrepresentations—indeed, the misrepresentations were made to string Overhill along as Defendants ransacked Wicked to avoid responsibility for its valid contracts.

110. Overhill reasonably relied on Defendants' misrepresentations. Overhill engaged with Defendants in good faith over the course of nearly half a year to secure payment of the

outstanding invoices, only to be met with threats by Defendants and a continued refusal to pay, all while Overhill continued to incur storage costs for products ordered by Wicked and while Overhill employees witnessed Wicked inventory using Overhill-manufactured products for sale on retail shelves.

111. Overhill was harmed as a result of Defendants' negligent misrepresentations.

112. Overhill's reliance on Defendants' negligent misrepresentations was a substantial factor in causing its harm.

**EIGHTH CAUSE OF ACTION – CONVERSION**

**(Against All Defendants)**

113. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

114. Overhill owned, possessed, and/or had a right to possess the Overhill-manufactured products that Wicked ordered pursuant to the Purchase Orders unless and until Overhill paid for such products, subject to the terms of the Agreement;

115. Defendants substantially interfered with Overhill's property by knowingly and/or intentionally taking possession of the Overhill-manufactured products and even selling such products at retail locations like Target without paying the Invoices.

116. Overhill did not consent to Defendants' conduct.

117. Overhill was harmed, and Defendants' conduct was a substantial factor in causing that harm.

118. Defendants engaged in the conduct alleged herein with malice, fraud and/or oppression as defined in California Civil Code Section 3294, entitling Overhill to punitive damages. Plaintiff is informed and believes, and thereon alleges, that the malice, fraud and/or oppression was undertaken by one or more officers, directors, and/or managing agents of Defendants, acting on Defendants' behalf, and/or the conduct was authorized, adopted and/or approved by Defendants' officers, directors and/or managing agents.

119. The conduct alleged herein constitutes an intentional theft coupled with an intentional misrepresentation, deceit, and/or concealment of a material fact known to Defendants

with the intention on the part of Defendants of thereby depriving Overhill of property or legal rights or otherwise causing injury. As noted above, the conversion was accomplished through misrepresentations regarding Defendants' intentions to pay Overhill, the nature of the relationship between Defendants, and the transaction pursuant to which Plant Foods and/or Ahimsa acquired Wicked's assets and took control of the brand, which were made by officers, directors and managing agents of Defendants – including Ahimsa's CEO, Matt Tullman – all of whom were responsible for the fraudulent transfer alleged herein. Defendants' conduct was also malicious because it was intended to cause financial injury to Overhill and/or was despicable and carried out with a willful and conscious disregard of Overhill's rights—indeed, Defendants knowingly and intentionally received Overhill-manufactured products without paying for them, restructured Wicked to avoid paying Overhill, and engaged in deceitful and bad faith conduct to injure Overhill when it sought repayment. Defendants' conduct was despicable and subjected Overhill to unjust hardship in knowing disregard of Overhill's rights.

## NINTH CAUSE OF ACTION – CIVIL CONSPIRACY TO COMMIT FRAUD AND CONVERSION

**(Against All Defendants)**

120. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

121. Wicked, Plant Foods, and Ahimsa were aware that each of them planned to engage in the fraudulent transaction, fraudulent misrepresentations, and conversion described herein.

122. Wicked, Plant Foods, and Ahimsa agreed with each other and intended that the fraudulent transaction, fraudulent misrepresentations, and conversion described herein be committed.

123. Defendants, individually and/or collectively, committed overt acts in furtherance of the conspiracy to engage in the fraudulent transaction, fraudulent misrepresentations, and conversion described herein by entering into the transaction pursuant to which Plant Foods and/or Ahimsa purported to acquire Wicked while disclaiming responsibility for its liabilities, by making

the misrepresentations described above to Overhill, and by unlawfully converting Overhill's products.

124. Defendants engaged in the conduct alleged herein with malice, fraud and/or oppression as defined in California Civil Code Section 3294, entitling Overhill to punitive damages. Plaintiff is informed and believes, and thereon alleges, that the malice, fraud and/or oppression was undertaken by one or more officers, directors, and/or managing agents of Defendants, acting on Defendants' behalf, and/or the conduct was authorized, adopted and/or approved by Defendants' officers, directors and/or managing agents.

125. The conduct alleged herein constitutes an intentional theft coupled with an intentional misrepresentation, deceit, and/or concealment of a material fact known to Defendants with the intention on the part of Defendants of thereby depriving Overhill of property or legal rights or otherwise causing injury. As noted above, the conversion was accomplished through misrepresentations regarding Defendants' intentions to pay Overhill, the nature of the relationship between Defendants, and the transaction pursuant to which Plant Foods and/or Ahimsa acquired Wicked's assets and took control of the brand, which were made by officers, directors and managing agents of Defendants – including Ahimsa's CEO, Matt Tullman – all of whom were responsible for the fraudulent transfer alleged herein. Defendants' conduct was also malicious because it was intended to cause financial injury to Overhill and/or was despicable and carried out with a willful and conscious disregard of Overhill's rights—indeed, Defendants knowingly and intentionally received Overhill-manufactured products without paying for them, restructured Wicked to avoid paying Overhill, and engaged in deceitful and bad faith conduct to injure Overhill when it sought repayment. Defendants' conduct was despicable and subjected Overhill to unjust hardship in knowing disregard of Overhill's rights.

## TENTH CAUSE OF ACTION – UNJUST ENRICHMENT

**(Against All Defendants)**

126. Defendants received a benefit from Overhill: $941,359.72 in products, both delivered and stored, plus storage fees exceeding $50,000 as of April 2025 and custom ingredients and packaging ordered by Overhill on Wicked's behalf.

127. The benefit Defendants received from Overhill came at Overhill's expense, as Overhill manufactured, delivered, and/or stored the products and ingredients pursuant to Wicked's Purchase Orders.

128. It would be unjust for Defendants to retain the benefit without compensation to Overhill, as Overhill has been unpaid for its product since May 2024 while Wicked-branded products manufactured by Overhill have remained on retail shelves, with the benefits inuring to Defendants.

**ELEVENTH CAUSE OF ACTION – DECLARATORY RELIEF**

**(Against All Defendants)**

129. Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

130. Pursuant to the Agreement, and the Purchase Orders issued thereunder, Overhill has a right to payment from Wicked in the amount of $941,359.72, plus storage fees exceeding $50,000 as of April 2025.

131. Through a sham transaction designed to allow Defendants to receive Wicked's valuable assets while leaving Wicked as a shell entity unable to pay creditors like Overhill, Wicked transferred property and/or incurred an obligation to Ahimsa and/or Plant Foods.

132. Overhill thus seeks a declaration that (1) Defendants are responsible for Wicked's liabilities to Overhill under the Agreement; and/or (2) Wicked's transaction with Defendants, whereby Wicked purported to transfer assets to Defendants without transferring liabilities, is invalid and unenforceable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for orders and judgment as follows:

1. For contractual, compensatory, statutory, and/or punitive damages in an amount to be proven at trial, plus interest;

2. Attorneys' fees and costs as provided for in Section 16 of the Agreement;

3. An order voiding the fraudulent transfer of Wicked's assets to Plant Foods and/or Ahimsa;

4. Pre- and post-judgment interest;

5. Injunctive or other equitable relief as appropriate; and

6. Any other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 2, 2025

BROWN NERI SMITH & KHAN LLP

By: ______________________
Anita P. Wu
Jackie K.M. Levien
Ethan J. Brown
Attorneys for Plaintiff Overhill Farms, Inc.

# EXHIBIT A

# MANUFACTURING AND SUPPLY AGREEMENT

THIS MANUFACTURING AND SUPPLY AGREEMENT (this "Agreement") is entered into as of the _03 day of _October, 2023 ("the Effective Date"), by and between Wicked Kitchen Inc, a Minneapolis corporation with its principal place of business located at 817 5th Ave South Ste 400 Minneapolis, Mn 55404 ("Customer") and Overhill Farms, Inc., a Nevada corporation, with offices located at 2727 E. Vernon Avenue, Vernon California, 90058 ("Overhill").

WHEREAS, Overhill has the know-how and capability to manufacture and package certain frozen foods products; and

WHEREAS, Customer desires to retain the services of Overhill to manufacture and package certain frozen food products.

NOW, THEREFORE, in consideration of the terms and conditions set forth herein, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Products.

1.1 Products and Specifications. Overhill agrees to manufacture the products described, along with applicable pricing, on Exhibit A to this Agreement (collectively, the "Products"). For each such Product, Customer shall provide Overhill with the Product specifications the ("Specifications") and Overhill shall manufacture the Products according to such Specifications, which are attached hereto as Exhibit B. The parties acknowledge and agree that any changes to the Specifications require, before implementation of such changes, no less than sixty (60) days written notice, the mutual written consent of the parties, and written agreement as to new pricing.

1.2 Exclusive Manufacturer. Overhill shall be Customer's exclusive manufacturer in the United States for the Products during the Term of this Agreement.

1.3 Additional Products. Upon mutual written agreement of the parties, additional products may be added as Products under this Agreement by an executed Amendment to Exhibit A describing the products to be added and the applicable pricing terms.

2. Term.

The term of this Agreement shall commence on the Effective Date and shall continue for two (2) year(s) (the "Initial Term"). Upon expiration of the Initial Term, this Agreement shall automatically renew for additional one (1) year terms (each a "Renewal Term"). The Initial Term and any Renewal Terms shall be collectively referred to as the "Term" throughout this Agreement.

3. Termination.

3.1 Voluntary Termination. Upon expiration of the Initial Term, each party shall have the right to terminate this Agreement by providing the other party at least one hundred eighty (180) days advance written notice of its intent to terminate this Agreement.

3.2 Termination for Breach. Either party may terminate this Agreement for breach by providing the breaching party with written notice of the breach and a thirty (30) day period for curing such breach. In the event the breach is cured within the thirty (30) day period, this Agreement shall continue in full force and effect. In the event the breach is not cured within the thirty (30) day period, the non-breaching party shall have the option, but not the obligation, to terminate the agreement upon expiration of the thirty (30) day cure period.

3.3 Termination for Insolvency. This Agreement may be terminated immediately by either party in the event the other party: (a) becomes insolvent; (b) files or has filed involuntarily against it a petition under the United States Bankruptcy Code or under or pursuant to any state bankruptcy act or under any similar federal or state law; (c) admits in writing its inability to pay its debts generally as they become due.

3.4 Survival of Representations and Warranties. Any warranties, performance, or payment obligations/requirements, covenants and agreements described in this Agreement, which given their nature and content, should survive any expiration or termination of this Agreement, shall so survive any expiration or termination of this Agreement.

4. Pricing and Payment Terms.

4.1 Pricing (Toll Charge Plus Materials Cost). The initial price ("Baseline Price") to be paid by Customer for each Product is listed on Schedule A attached hereto, which includes two pricing components: (i) a fixed component representing all manufacturing costs, i.e. overhead, profit and all manufacturing costs except the cost of the Product materials (the "Toll Charge"): and (ii) a variable component for the cost of Product materials ("Materials Cost"). Customer's Baseline Price is subject to an adjustment each calendar quarter based on variances in the Materials Cost, whereby the monthly variances for the three (3) consecutive months comprising the calendar quarter will be offset against each other to achieve a single net adjustment for the next calendar quarter. Such net adjustment will then be taken against the Baseline Price, and the resulting price will supersede the Baseline Price(s) listed in Exhibit B. Prices shall continue adjusting in this manner going forward throughout the Term of the Agreement. The Toll charge will be increased once every twelve (12) months of the Agreement Term. Contractor's tolling or conversion fee ("Toll Charge") shall be deemed to include, among other things, straight time labor costs, overhead, utilities, energy costs, and all other variable and fixed costs and expenses associated with the manufacture of the Products other than Product Supplies Costs. The parties agree that the Tolling Fee set forth in Exhibit B of this Agreement shall be subject to increase during the Term of this Agreement as follows:

a. *Annual Adjustment*. The Toll Chargeshall be subject to increase based on actual changes in costs and expenses, as reasonably substantiated by Overhill. The parties agree to discuss adjustment in advance of the effective date of such adjustment.

b. *Cap*. Any annual adjustment shall not exceed 5% or the applicable Consumer Price Index (CPI) (for Archbold, OH or Vernon, CA, depending on applicable Facility, as of the Effective Date), or whichever is greater.

4.2 Terms. Payment terms shall be net thirty (30) days.

5. Forecasts; Purchase Orders.

5.1 Annual Volume Commitment. In exchange for the Product pricing offered by Overhill, Customer agrees to purchase the agreed upon annual minimum quantity of Product purchases (the "Annual Volume Commitment") set forth in the attached Exhibit C. Customer agrees that such Annual Volume Commitment constitutes the minimum annual purchase quantities of Products to be made by Customer in order to receive the pricing set forth on Exhibit B. If Customer fails to purchase the total quantities of Products set forth in the Annual Volume

Commitment, Customer shall pay to Overhill, within fifteen (15) days of invoice date from Overhill, the dollar amount per case multiplied the case quantity shortfall as Annual Volume Commitment, as ser forth on Exhibit C.

5.2 Forecasts. Customer agrees to provide Overhill with a rolling thirteen (13) week forecast, updated on a weekly basis, of its anticipated Product purchases (the "Forecast"). The most current four (4) weeks of such Forecasts will constitute binding purchase orders, and the remaining six (9) weeks will not constitute binding purchase orders but Overhill shall be entitled to rely upon the entirety of the thirteen (13) week Forecasts when ordering Materials as further provided herein.

5.3 Binding Orders. The parties agree that the Customer shall electronically submit to Overhill purchase orders for Products on a rolling weekly basis at least four (4) weeks prior to the requested delivery date and corresponding to the Product quantities contained in the most current four (4) weeks of the Forecast. All Product quantities must constitute full production run quantities. Each purchase order will be subject to written acceptance by Overhill and will become binding orders only upon such acceptance ("Binding Orders"). In the event Overhill does not accept or deny a purchase order within three (3) business days of receipt, such silence will be deemed an acceptance by Overhill of the purchase order.

6. Product Pick Up and Title

6.1 Product Pick Up. All Product shall be made available for pick up by Customer or by Customer's third party freight carriers F.O.B. Overhill's designated distribution facilities. Customer agrees to pick up the Products within seventy two (72) hours of notification by Overhill. If Customer fails to pick up the Products within such time period, Customer will be charged $9.00 per pallet for each full or partial month of storage required.

6.2 Liability for Product. Liability for the Product, including risk of damage, theft, and loss, shall pass from Overhill to Customer upon loading such Product on the freight carrier.

7. Materials.

7.1 Purchase of Materials. Overhill agrees to procure sufficient inventories of materials and packaging ("Materials") necessary to manufacture and package Products in accordance with the Binding Orders. For Materials having a lead time greater than four (4) weeks or requiring a minimum quantity greater than needed to fulfill the Binding Orders, the parties agree that Overhill shall purchase such Materials based upon the thirteen (13) week Forecast or such minimum orders and/or lead time required by the Material vendor. For any Materials requiring an annual or seasonal commitment by Overhill in order to lock in pricing, including but not limited to poultry and vegetables, Overhill shall be entitled to rely upon the Annual Volume Commitment in making its commitment to the Materials vendor. With respect to the purchase of paperboard, the parties agree that Overhill shall purchase such paperboard approximately four (4) months in advance in accordance with the most current four (4) months of the Forecast. In the event there are any unused Materials that were purchased by Overhill in reliance on the Binding Orders, the Forecasts, the Annual Volume Commitment, or pursuant to minimum quantities or lead times set forth above, Customer shall promptly reimburse Overhill for the actual cost of all such unused Materials, whether due to Product discontinuance, change in Specifications, termination of the Agreement, or for any reason(s) or circumstance(s) not caused by Overhill.

7.2 Suppliers of Materials. Overhill shall have the right to decide the sources to be used for the Materials. Overhill shall conduct its standard visual inspection of all Materials prior to

production. Where Customer requests that Overhill purchase certain Materials directly from one or more sources designated by Customer (each, a "Requested Source"), such Requested Source(es) must first meet Overhill's regulatory and legal compliance requirements before Overhill procures any Materials from such Requested Source. In the event Materials procured from a Requested Source, or Materials supplied directly by Customer, fail to meet the applicable Specifications, fail to meet delivery deadlines, or have any quality or compliance issue, Customer agrees it shall assume full responsibility and shall promptly reimburse Overhill within fifteen (15) days of invoice date from Overhill for any and all documented costs, expenses, claims, demands, and/or losses incurred as a result of the Materials supplied by such Requested Source or supplied by Customer ("collectively "Claims"), including but not limited to Claims related to delays, additional labor and/or testing, production inefficiencies, quality issues, market withdrawal, Product recall, and/or customer complaints/ claims. The parties agree that no ingredients originating from countries outside of the United States shall be purchased for use in the Products without mutual written consent.

8. Packaging.

Customer shall be responsible for and shall supply the key lines, artwork, printing plates, designs, ingredient and nutritional information (collectively "Product Labelling"), and any other written statements related to the Product claims and/or Product attributes (collectively "Product Claims"). Customer further agrees to be responsible for ensuring that any Product Labelling and Product Claims are accurate, not misleading, and comply with all applicable laws and regulatory requirements. Customer undertakes liability for any costs, expenses, losses, and/or claims arising from the Product Labelling and/or Product Claims. Overhill will package the Products in customer designed packaging so long as such packaging is consistent with Overhill's standard operations.

9. Quality Control.

9.1 Quality Manual. Overhill agrees to maintain high standards in manufacturing and packaging and shall manufacture and package the Products in accordance with its Food Safety and Quality Requirements ("Quality Manual"), which may be updated by Overhill from time to time. Overhill will allow Customer, or its designated representatives, to review onsite a copy of Overhill's quality control and processing manuals that relate to the safety and quality of the manufacture and storage of Materials and Products.

9.2 Compliance with the Law. Overhill agrees that Products will be manufactured and packaged in compliance with all applicable federal, state and local laws, regulations, rules and guidelines, including but not limited to good manufacturing practices prevailing in the industry, now in effect or which may hereinafter come into effect.

9.3 Production Records. Overhill will keep and maintain, for a period of at least two (2) years following each production run, complete and accurate production, quality control, and distribution records relating to Products. Customer will have the right to inspect such records once annually on a confidential basis with five (5) business days' notice at Overhill's facility during normal business hours.

9.4 Facility Visit. Overhill agrees to allow representatives of Customer to visit the specific areas of its facilities that involve the production of the Product upon written request at a mutually agreed upon time. Customer shall sign Overhill's standard facilities visitation agreement prior to such visit.

10. Non-Conforming Products.

Overhill will manufacture the Products in accordance with the Specifications. In the event any Products are noncompliant with the Specifications, as verified by Overhill, ("Non-Conforming Products"), Overhill will replace the Non-Conforming Products with conforming Products or, alternatively, provide Customer with a credit for the amount paid for such Products. Products determined to be Non-Conforming will be returned to Overhill at Overhill's expense, or disposed of by Customer as directed by Overhill, at Overhill's expense. Customer agrees that this section 10 sets forth Customer's sole and exclusive remedy for any Non-Conforming Products.

11. Product Recall and Customer Complaints.

11.1 Product Recall. Overhill and Customer agree to comply with any mandate or request from a governing regulatory agency, made pursuant to applicable USDA and/or FDA laws and regulations, to initiate a product recall, market withdrawal, product correction, and/or advisory safety communication regarding the Products (collectively and individually referred to as a "Recall"). The parties shall reach agreement as to the content of any remarks, public statements, and/or press releases before making or releasing the same. Any and all actions to be taken by the parties in connection with such Recall shall be in accordance with FDA and USDA guidance, policies, and regulations, as well as any other applicable laws. If the Recall is due to a breach by Overhill of its obligations under this Agreement, the parties agree that Overhill's liability and Customer's exclusive remedy shall be the "replace or refund" options set forth in section 10.

11.2 Customer Complaints. Customer shall handle all consumer complaints related to the Products but shall notify Overhill in real time of all credible customer complaints of Non-Conforming Products. In the event of Non-Conforming Product complaints by customers, the parties shall work cooperatively to resolve the same consistent with the terms of this Agreement.

12. Intellectual Property.

12.1 Pre-Existing IP Rights. Each party shall at all times contain to maintain ownership of its pre-existing intellectual property right and trade secrets. Nothing in this Agreement shall be deemed to grant to one party any right, title, interest or license to any of the other party's trademarks, trade names, service marks, logos, production methods or processes, product formulas or recipes, patents, copyrights or patentable or copyrightable designs or material (collectively "Intellectual Properties"). However, Overhill shall have the right to use Customer's Intellectual Properties in order to produce the Products pursuant to its obligations under this Agreement.

12.2 New Developments. Product formulations, specifications, trade secrets, production methods, and processes developed or co-developed by Overhill during the Term of this Agreement shall remain Overhill's Intellectual Properties unless separately paid for by Customer and transferred to Customer in a written agreement.

13. Warranties.

13.1 As to Overhill. Overhill warrants that the Products will, *as of the time they are loaded on the freight carrier's truck*:

(a) be free from defects in design, materials, manufacturing and workmanship *other than* defects arising from Materials supplied by a Requested Source;

(b) conform to the Specifications and all applicable laws, except for any non-conformance caused by Materials supplied by a Requested Source or any Product labelling or Product claims;

(c) be free and clear of all security interests, liens, charges or encumbrances; and

(d) not be an article that it is unlawful to introduce into interstate commerce under Section 404 of the Act.

13.2 As to Customer. Customer represents and warrants that:

(a) all Intellectual Property provided to Overhill, including but not limited to the trademarks, copyrights, trade dress, and logos, are exclusively owned by Customer and do not infringe the rights of any third parties;

(b) it shall at all times properly store the Products after delivery Customer's facility so as to ensure the quality and safety of the Products and not take any action, or fail to take actions, that would compromise the quality and/or safety of the Products;

(c) all Product Claims and Product Labelling is accurate, not misleading, and compliant with all applicable laws and regulations (so long as the Products are manufactured according to the Specifications); and

(d) it has the full right and power to enter into this Agreement and by so doing it does not violate any agreement, promise, obligation, or representation to any third party.

14. Confidentiality and Non-Disclosure.

Customer and Overhill each agree that it is bound by a Confidentiality and Non-Disclosure Agreement entered into between them and dated May 8th, 2023, attached hereto as Exhibit D.

15. Force Majeure.

Overhill and Customer will each be excused from performing their respective obligations under this Agreement to the extent that such performance is prevented by fire, storm, flood, earthquake, explosion, accidents, riots, labor strikes, acts of God, acts of the public enemy, sabotage, newly enacted laws and regulations that were not anticipated on the effective date of this Agreement, pandemics, national health emergencies, terrorism, cyberattacks, labor shortages, ingredient shortages, supply chain disruptions, or any other cause beyond the reasonable control of the party that is not able to perform its respective obligations under this Agreement (each a "Force Majeure Event"); provided that (a) any party that is unable to timely perform its obligations hereunder due to a Force Majeure Event will use commercially reasonable efforts to resume the timely performance of its obligations when it is commercially possible; and (b) if such party is unable to begin to resume partial or full performance of its obligations hereunder within sixty (60) days after the beginning of the Force Majeure Event, then the other party may terminate this Agreement by written notice. This section shall not excuse payment obligations between the parties.

16. Indemnification.

(a) Scope of Indemnification. Customer and Overhill (each an "Indemnifying Party") shall each defend, indemnify and save and hold harmless the other party and such party's parent, subsidiary, and commonly-owned affiliate companies, and each of their shareholders, officers, directors and employees, (collectively, the "Indemnified Party"), harmless from and against any and all claims,

demands, and causes of action, damages, liabilities, judgments, costs, and expenses (including reasonable attorneys' fees) caused by a breach of any obligation or warranty under this Agreement or a violation of applicable law.

(b) Indemnifying Party Controls Defense. The Indemnified Party will provide the Indemnifying Party with prompt written notice of any indemnification obligation of the Indemnifying Party. The Indemnifying Party shall select counsel and shall control the defense of the parties, however, the Indemnified Party may elect to participate in the defense of any such Action with counsel of its choice at its own cost and expense.

(c) Consent to Resolution. The Indemnifying Party may enter into a settlement without the Indemnified Party's consent, however, it must obtain the Indemnified Party's prior written consent prior to entering into to any settlement agreement that requires the Indemnified Party to engage in a particular action, conduct, or course of business or to refrain from engaging in the same, or to change the manner in which the Indemnified Party conducts its business. The Indemnifying Party must also obtain the Indemnified Party's written consent prior to making any admission of liability or judgment against it and prior to making any public statement involving the Indemnified Party.

17. Limitation of Liability. THE PARTIES AGREE THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INCIDENTIAL, CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE, OR EXEMPLARY DAMAGES, regardless of the nature of the claim.

18. Insurance.

Each party shall maintain at its expense commercial/comprehensive general liability insurance (including bodily injury, property damage, product liability, contractual liability and completed operations coverage), in a minimum amount of Five Million Dollars (5,000,000), per occurrence and Ten Million Dollars ($10,000,000) aggregate, and Worker's Compensation Insurance as required by law. Limits of liability requirements may be satisfied by a combination of commercial general liability and umbrella and/or excess liability policies, and each party shall name the other party as an additional insured on such insurance policy(ies). Additionally, each party shall obtain prior to the execution of this Agreement and maintain throughout the Term of this Agreement, a product contamination/ product recall policy in the amount of at least One Million Dollars ($1,000,000) including an endorsement for third party business losses and consequential damages. Each party's certificates evidencing the insurance coverages required herein are attached hereto as Exhibit E, which each party agrees not to cancel or modify such coverages throughout the Term of this Agreement.

19. Notices.

All notices or other communications between the parties given pursuant to this Agreement will be deemed to have been given when delivered by a nationally recognized next-day delivery service (e.g., Federal Express, UPS, or USPS). All formal notices shall be sent to the following persons:

| | |
|---|---|
| If to Overhill: | Overhill Farms<br>2727 E. Vernon Avenue<br>Vernon, CA 90058<br>Attn: Anat Julintorn, Chief Executive Officer |
| If to Customer: | Wicked Foods Inc.<br>817 5th Ave South Ste 400<br>Minneapolis, Mn 55404<br>Attn: Pete Speranza, Chief Executive Officer |

20. Miscellaneous.

(a) Change in Control and Assignment. Neither party may assign or transfer this Agreement without the written consent of the other party, which shall not be unreasonably withheld. However, in the event that (i) any person or entity, directly or indirectly, acquires ownership or control of 49% or more of the voting securities or ownership interests of either party hereto; or (ii). either party is merged with or into another entity, resulting in the loss of control over its business and affairs (each such event being a "Change In Control"), no written consent shall be required from the other party for assigning the agreement conditioned advance written notice of at least fifteen (15) days being provided to the other party. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

(b) Waiver. The waiver of any breach of any provision of this Agreement shall not be effective unless contained in a written agreement signed by an authorized officer of the waiving party. No waiver shall be deemed to occur or arise from any course of dealing. Any such waiver shall be effective only in the specific instance and for the specific purpose for which it is given.

(c) Severability. If any provision of this Agreement or any portion thereof shall be found or held to be unenforceable or invalid, such provision or portion thereof shall be deemed deleted from the Agreement and the remaining provisions of the Agreement shall remain in effect to the extent that approach is consistent with the intention and primary commercial purpose of the parties in making this Agreement, or, alternatively, such illegal or invalid provision shall be modified or replaced by the written agreement of the parties in a manner that makes it legal and valid.

(d) Construction. This Agreement shall be construed as having been negotiated and jointly drafted by the parties hereto, and shall not be construed against either party based upon either party being deemed the drafter of the Agreement.

(e) Dispute Resolution. Any dispute between the parties arising under or in connection with this Agreement shall be resolved as follows: (a) the senior managers of Customer and Overhill shall negotiate in good faith in an attempt to resolve the dispute if the dispute has not been resolved by the mid-level managers involved in the matter within thirty (30) days of those mid-level managers first attempt to resolve the dispute; (b) if the senior managers of the parties are unable to resolve the dispute after ten (10) business days' of good faith negotiations, then the parties shall participate in mandatory mediation with a mutually agreeable mediator that is either a litigation partner in a law firm or a former federal or state trial court judge; (c) if the parties are unable to resolve the dispute after one full day of mediation, then either party may file a lawsuit to resolve the dispute consistent with the provisions below.

(f) Governing Law. The interpretation of this Agreement, and any dispute arising hereunder or in connection herewith, shall be governed by the laws of the State of California and any claims shall be filed in the state or federal courts located in Los Angeles, California.

(g) Counterparts. This Agreement may be executed in one or more counterparts, each of which shall take effect as an original, and all of which shall evidence one and the same agreement.

(h) Setoff. Customer shall not have any right of setoff against payments due to Overhill.

(i) Independent Contractor. The parties are independent contractors, engaged in the operation of their respective businesses, and neither party shall be the agent of the other for any purpose. Nothing in this Agreement shall be interpreted or construed as making the parties partners, joint venturers, or agents of the other, nor shall either party so represent to any third person. The

employees, agents or subcontractors of one party shall not be considered the employees, agents or subcontractors of the other party. Neither party shall have the authority to bind the other.

(j) Modification. This Agreement may not be altered, modified, or changed except through a written agreement signed by an authorized officer of each party. If the terms or conditions of any purchase order, order acceptance, invoice, or similar standard commercial document supplement or conflict with the terms of this Agreement, then the terms of this Agreement alone shall be controlling.

(k) Entire Agreement. This Agreement, together with all exhibits and addendums hereto, constitutes the entire agreement between the parties hereto with regard to the subject matters described herein, and there are no other agreements or understandings between the parties with regard to such matters. This Agreement supersedes any previous understandings or agreements of the parties, and supersedes the terms and conditions of any purchase order or other business document not expressly agreed to by the parties (whether written or oral) with respect to the subject matters described herein.

IN WITNESS WHEREOF, a duly authorized representative of each of the parties have executed this Agreement as of the date first above written.

| WICKED FOODS INC | OVERHILL FARMS |
|---|---|
| By: [signature] | By: [signature] |
| Print Name: Orlando Villegas | Print Name: Kelley Battles |
| Title: Supply Chain Director | Title: VP of Co-Manufacturing & Private Label |

**EXHIBIT A**
**Product Specifications**

Sriracha Tofu Specification (pdf.io).p

Tofu Panang Specification (pdf.io).p

Naked Burrito Specification.pdf

Korean Bowl Specification (pdf.io).p

# EXHIBIT B
## Products and Pricing

*Pricing herein is based on Annual Volume Commitment ("AVC") set forth in Exhibit C. In the event Customer fails to purchase the quantity of Products equal to the AVC, Customer agrees to pay to Overhill within fifteen (15) days of invoice to the dollar amount equal to: the Toll Fee multiplied by the quantity of the AVC shortfall, plus the cost of any unused Materials.

**R&D:**
For work beyond reasonable commercialization of customer supplied formulations a fee of $1,800 per day or $250 per hour applied, reconciled on a monthly basis with payment terms as stated in the Agreement.

**Product Testing / Trials:**
For developed product testing and trial line time will be secured at a cost of $18,000 per 8 hour shift plus total cost of Direct Labor assigned and 100% of Materials used.

**Regulatory**
For work beyond reasonable commercialization of customer supplied formulations a fee of $1,800 per day or $250 per hour applied reconciled, on a monthly basis with payment terms same as stated in the Agreement.

**Commercialization Start Up Costs:**
During agreed "Start Up Curve" timing reimbursement of costs incurred due to inefficiencies of new product production to be negotiated and agreed prior to first production.

**EXHIBIT C**
**Annual Volume Commitment**

Identify the number of cases per SKU and the specific timeframe, i.e. calendar year or consecutive 12-month period

| Code | Description | 2024 Forecasted Volume | 2024 Tolling | 2025 Forecasted Volume |
|---|---|---|---|---|
| 23-112 A7 | Naked Burrito | 36,387 | $1.83 | 36,387 |
| 23-112 B5 | Korean Bowl | 37,870 | $1.82 | 37,870 |
| 23-112 D7b | Seriously Sriracha Tofu & Rice | 27,187 | $1.84 | 27,187 |
| 23-112 C5a3 | Peng Panang Tofu Curry | 34,693 | $1.88 | 34,693 |
| 23-112 F3 | Rockin' Chili Mac | 26,432 | $1.99 | 26,432 |
| 23-112 E5 | Hearty Rigatoni Veg Bolognese | 28,512 | $1.81 | 28,512 |
| | | | | |
| | | | | |
| | TOTAL | 191,081 | | 191,081 |

| 23-112 A7 | Size |
|---|---|
| Naked Burrito | 10oz |
| Ingredient | $0.74 |
| Pkg | $0.33 |
| Toll | $0.76 |
| | |
| All In | $1.83 |

| 23-112 B5 | Size |
|---|---|
| Korean Bowl | 10oz |
| Ingredient | $0.73 |
| Pkg | $0.33 |
| Toll | $0.76 |
| | |
| All In | $1.82 |

| 23-112 C5a3 | Size |
|---|---|
| Tofu Panang | 10oz |
| Ingredient | $0.77 |
| Pkg | $0.33 |
| Toll | $0.78 |
| | |
| All In | $1.88 |

| 23-112 D7b | Size |
|---|---|
| Sriracha | 10oz |
| Ingredient | $0.73 |
| Pkg | $0.33 |
| Toll | $0.78 |
| | |
| All In | $1.84 |

| 23-112 E5 | Size |
|---|---|
| Rigatoni | 10oz |
| Ingredient | $0.74 |
| Pkg | $0.33 |
| Toll | $0.74 |
| | |
| All In | $1.81 |

| 23-112 F3 | Size |
|---|---|
| Rockin Chili Mac | 10oz |
| Ingredient | $0.88 |
| Pkg | $0.33 |
| Toll | $0.78 |
| | |
| All In | $1.99 |

** All pricing is FOB Vernon, CA 90058

All Pricing is based on a double line of appx 12,600 cases per shift

**<u>EXHIBIT D</u>**
**Non-Disclosure Agreement**

[Attach the Parties' NDA]

# EXHIBIT B

Wicked Foods, Inc.
817 5th Ave. South
Ste. 400
Minneapolis MN 55404
United States

# Purchase Order

#PO-01717-5
4/16/2024

**Vendor**

Overhill Farms
2727 E. Vernon Avenue
Vernon CA 90058
United States

**TOTAL**

$449,115.60

**Receive By:**

| Receive By | Vendor # | Billing Phone |
|---|---|---|
| | | |

| | Quantity | Item | Rate | Amount |
|---|---|---|---|---|
| | 6,880 | **46098 Naked Burrito Bowl 10oz** Naked Burrito Bowl 10oz | $10.98 | $75,542.40 |
| | 5,868 | **46104 Korean Inspired Bowl 10oz** Korean Inspired Bowl 10oz | $10.92 | $64,078.56 |
| | 6,898 | **46111 Sriracha Tofu and Rice 10oz** Sriracha Tofu and Rice 10oz | $11.04 | $76,153.92 |
| | 5,989 | **46128 Panang Tofu Curry 10oz** Panang Tofu Curry 10oz | $11.28 | $67,555.92 |
| 1K102. | ~~7,900~~ 14000 | **46135 ROCKIN' CHILI MAC 10oz** ROCKIN' CHILI MAC 10oz | $11.94 | $94,326.00 |
| 1K105 | 6,580 | **46091 HEARTY RIGATONI VEG BOLOGNESE 10oz** HEARTY RIGATONI VEG BOLOGNESE 10oz | $10.86 | $71,458.80 |

**Total** $449,115.60

ACCOUNT NUMBER: 71600
CUSTOMER DUE DATE:
SHIP DATE: 4/29
TRUCK: P/UP.
ORDER/CONFIRMATION #: 180754



PO-01717

# EXHIBIT C

from: Bill.com Pg 1 of 2

**Miriam Ruiz**

| | |
|---|---|
| **From:** | BILL <account-services@inform.bill.com> |
| **Sent:** | Thursday, May 2, 2024 12:53 AM |
| **To:** | Miriam Ruiz |
| **Subject:** | [EXTERNAL] Wicked Foods, Inc received your invoice #40110 |

CAUTION: This mail is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments.

# Wicked Foods, Inc created a new bill for invoice #40110

**$73,152.96**

Bill amount

**What happens next?**

You don't need to do anything. Once processed, we'll let you know when the payment is on the way.

In the meantime, you can view the invoice details or track the payment status.

View Invoice

© 2024 Bill.com, LLC

Overhill Farms

from: Bill.com Pg 2 of 3

MR

# Invoices

Invoices Credit memos

6 results
$449,104.62

Create Invoice

Unpaid 10 | Drafts 0 | All invoices 46

Edit filters

Customer: Wicked Foods, Inc · Active invoices · Unpaid

Clear filters

| Number | Customer | Invoice date | Due date | Sent status | Payment status |
|---|---|---|---|---|---|
| 40290 | Wicked Foods, Inc | Apr 30, 2024 | Past due 3 months | Accepted | Unpaid |
| 40275 | Wicked Foods, Inc | Apr 29, 2024 | Past due 3 months | Accepted | Unpaid |
| 40274 | Wicked Foods, Inc | Apr 29, 2024 | Past due 3 months | Accepted | Unpaid |
| 40176 | Wicked Foods, Inc | Apr 26, 2024 | Past due 3 months | Accepted | Unpaid |
| 40110 | Wicked Foods, Inc | Apr 23, 2024 | Past due 3 months | Accepted | Unpaid |
| 40111 | Wicked Foods, Inc | Apr 23, 2024 | Past due 3 months | Accepted | Unpaid |



© 2024 BILL Operations, LLC.

# EXHIBIT D

Overhill Farms

July 22, 2024

Wicked Foods, Inc.
56 Edwards Village Blvd.
Edwards, CO 81632
Attn: Matt Tullman, CEO.

**FINAL DEMAND LETTER**

Dear Matt,

We are writing concerning the amount of **$449,104.62** which was due to be paid on 5/23/2024 and, despite numerous requests for payment, remains outstanding.

We demand that payment of the full amount be paid to us on or before Wednesday, July 31,2024.

If this account is not resolved by the specified date, we reserve the right to commence legal proceedings to recover the debt without further notice to you, and you may be responsible for any associated legal fees or collection costs from Seafax Collections Services (Agri-Wire)

If you wish to prevent this, please contact me at bmartinez@overhillfarms.com or 323-240-9565 as a matter of urgency and settle your account before the above date.

Sincerely,

Bridget Martinez
Director of Finance
Overhill Farms, Inc

# EXHIBIT E

BROWN NERI SMITH & KHAN

**Anita P. Wu, Esq.,** Partner
Brown Neri Smith & Khan LLP
11601 Wilshire Blvd., Suite 2080
Los Angeles, CA 90025
anita.wu@bnsklaw.com
Tel: (310) 935-3947

November 19, 2024

**VIA E-MAIL & OVERNIGHT MAIL**

Wicked Foods, Inc.
817 5th Avenue South Ste 400
Minneapolis, MN 55404
Orlando Villegas (orlando@wickedkitchen.com)
Paulina Gorszewski (paulina@wickedkitchen.com)
Pete Speranza (pete@wickedkitchen.com)

Re: *Overhill Farms, Inc. v. Wicked Foods, Inc. et al.*: Demand for Mediation

Dear Mr. Speranza, Mr. Villegas, and Ms. Gorszewski:

The law firm of Brown Neri Smith & Khan LLP has been retained by Overhill Farms, Inc. ("Overhill") to recover long-overdue balances owed by Wicked Foods, Inc. dba Wicked Kitchen ("Wicked"), and to investigate and pursue related claims for the losses and damages suffered by Overhill as a result of Wicked's failure and refusal to make payment.

This letter serves as a formal demand for mediation under Paragraph 20(e) of the parties' Manufacturing and Supply Agreement dated October 3, 2023. Please promptly forward this correspondence to any and all representatives of Wicked and/or other associated entities whose involvement may be necessary to fully resolve this matter.

As you know, an unpaid principal balance of $449,104.62 has been owed by Wicked since May 2024, for inventory received pursuant to Invoice Nos. 40110, 40111, 40176, 40274, 40275, and 40290. As has also been repeatedly detailed in prior correspondence to you, Wicked also is responsible for an additional $436,774.38 of inventory, as well as associated storage fees and materials purchased on your behalf.

Over the course of the past many months, Overhill has undertaken extensive efforts and made countless attempts to secure payment from Wicked and to resolve these matters amicably.[1] Wicked's management has repeatedly acknowledged the outstanding sums owed to Overhill, and represented that payment was forthcoming. Nonetheless, to date, Wicked still has not paid any of the outstanding amounts, or made arrangements for payment.

---

[1] This includes but is not limited to Overhill's written correspondence dated May 30, 31; June 5, 6, 10, 14, 21, 25, 27; and July 2, 3, 9, 10, 15, 22, 24, 31.

At Wicked's direction, Overhill also attempted to address these matters with the Ahimsa Group's management, insofar as Wicked represented that it was acquired by Ahimsa and was under Ahimsa's new ownership and leadership. Wicked further represented that the outstanding balances to Overhill would need to be handled and approved by its new leadership.

However, directly contradicting those representations, Ahimsa has informed us that Wicked was not in fact acquired by Ahimsa, and is not a member of the Ahimsa Group. Ahimsa has also disclaimed any involvement with, or responsibility for, Wicked's debts and contractual obligations to Overhill. In fact, Ahimsa has threatened to sue Overhill if it engages in any further attempts to discuss or collect the overdue balances from Ahimsa.

Obviously, this is an untenable and unacceptable position for Overhill to be placed in. Wicked's refusal to respond in good faith to Overhill's repeated inquiries and efforts to resolve these matters is unjustified, and Overhill has been forced to incur substantial time and expense to enforce Wicked's contractual obligations. We reiterate our longstanding demand that the outstanding balances be immediately paid.

Absent immediate payment of all outstanding sums, Overhill demands that the parties participate in mandatory mediation with a mutually agreeable mediator, in accordance with the parties' dispute resolution clause. By no later than **November 25, 2024**, please provide (a) the names of any proposed mediators, and (b) available dates within the next month.

Additionally, to ensure that the mediation is attended by all necessary parties with the requisite authority to resolve these disputes, please promptly provide clarification as to the relationship between Wicked and Ahimsa. In particular, please advise whether it remains Wicked's position that it was acquired by Ahimsa, and that payment of its outstanding balances to Overhill requires the approval of Ahimsa leadership. Please further advise whether it is Wicked's position that, following Ahimsa's acquisition, Wicked was left with insufficient assets to pay its outstanding debts to Overhill and/or is no longer responsible for those debts.

Please be advised that, if Wicked fails or refuses to respond to this mediation demand, or if these matters are not fully resolved at mediation, then Overhill will proceed with pursuing all available legal remedies, including by filing claims against Wicked and associated responsible parties. It is my hope that we will be able to resolve these matters amicably, without the need for protracted litigation. However, as you know, Overhill has already expended considerable time and needless expense in trying to secure Wicked's unpaid debts. It will not tolerate further delay, misdirection, or bad faith conduct on Wicked's part. Overhill will not hesitate to pursue all remedies, relief and recourse necessary and available to protect its interests and enforce Wicked's contractual obligations.

Finally, this will serve as formal notice that, in anticipation of litigation, Wicked must preserve all documents, communications, and other evidence related to the foregoing matters, whether in hard copy or digital format. Destruction, alteration or concealment of any such evidence will be subject to sanctions and penalties if litigation becomes necessary.

I look forward to your cooperation in resolving these matters.

Very truly yours,

Anita P. Wu, Esq.
BROWN NERI SMITH & KHAN LLP
anita.wu@bnsklaw.com

# EXHIBIT F

BROWN NERI SMITH & KHAN

**Anita P. Wu, Esq.,** Partner
Brown Neri Smith & Khan LLP
11601 Wilshire Blvd., Suite 2080
Los Angeles, CA 90025
anita.wu@bnsklaw.com
Tel: (310) 935-3947

January 31, 2025

**VIA ELE TRONI MAIL**

Wicked Foods, Inc.
c/o Craig R. Jalbert
Verdolino & Lowey, P.C.
124 Washington Street, Suite 101
Foxboro, MA 02035

Re: *Overhill Farms, Inc. v. Wicked Foods, Inc. et al.*: Request for Further Information

Dear Mr. Jalbert:

Thank you for your previous correspondence regarding the wind-down of Wicked Foods, Inc. ("Wicked"). Overhill Farms, Inc. ("Overhill") appreciates the context provided regarding Wicked's financial position and the challenges leading to its current state. While we understand your letter to be a rejection of Overhill's demands for payment and/or mediation in light of the circumstances, we would appreciate further information. We are hopeful that further clarification regarding Wicked's assets and obligations will help Overhill determine whether legal proceedings are called for to resolve its concerns.

In that spirit, and to ensure we have a full understanding of the facts, we respectfully request additional information on the following matters:

1. You indicated that Wicked entered into a sale of substantially all of its assets with its senior secured creditor in lieu of foreclosure. We would like to know the total amount of secured debt owed by Wicked at the time of the asset transfer.
2. What was the nature of the collateral pledged by Wicked, and what were the specific obligations secured
3. What categories of assets did the senior secured creditor acquire from Wicked (e.g., inventory, intellectual property, equipment)
4. How were the assets valued at the time of the transfer or liquidation Was an independent appraisal conducted What was the approximate value assigned
5. Were proceeds realized from the transfer or sale of assets If so, how were the proceeds distributed
6. Beyond the secured collateral, were there any non-collateralized assets remaining with Wicked following the asset transfer If so, how were those assets handled
7. Are there any accounts receivable, residual inventory, or other recoverable assets that could reduce Wicked's liabilities to creditors

8. Does Wicked have final financial statements or a liquidation analysis that outlines the allocation of its assets and liabilities

We appreciate your assistance in clarifying these matters. We hope that by addressing these questions, we can reach an understanding that allows Overhill to avoid additional steps. We kindly request your response no later than February 10, 2025.

We also take this opportunity to reiterate that Wicked remains under a litigation hold obligation to preserve all documents, communications and other evidence related to these matters. This includes but is not limited to correspondence regarding the sale or transfer of assets, financial records, and any communications with creditors or associated third parties.

Should you have any questions or wish to discuss by phone, please feel free to contact me.

Very truly yours,

Anita P. Wu, Esq.
BROWN NERI SMITH & KHAN LLP
anita.wu@bnsklaw.com

# EXHIBIT G




(Photographed on December 21, 2024 at Target, 3433 Sepulveda Blvd., Torrance, CA 90505)




(Photographed on December 21, 2024 at Target, 3433 Sepulveda Blvd., Torrance, CA 90505)

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
Anita P. Wu (SBN 248876); Ethan J. Brown (SBN 218814); Jackie Levien (SBN 301239)
Brown, Neri, Smith & Khan LLP, 11601 Wilshire Blvd., Ste. 2080, Los Angeles, CA 90025

TELEPHONE NO.: (310) 935-3947 FAX NO.: (310) 593-9980
EMAIL ADDRESS: anita.wu@bnsklaw.com; ethan@bnsklaw.com; jackie@bnsklaw.com
ATTORNEY FOR *(Name)*: Plaintiff Overhill Farms, Inc.

FOR COURT USE ONLY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/02/2025 5:27 PM David W. Slayton, Executive Officer/Clerk of Court, By E. Galicia, Deputy Clerk**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Spring Street
MAILING ADDRESS: 111 North Spring Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Overhill Farms, Inc. v. Wicked Foods, Inc. a.k.a. Wicked Kitchen Inc., et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: 25STCV12952 |
|---|---|---|
| [X] **Unlimited** (Amount demanded exceeds $35,000) [ ] **Limited** (Amount demanded is $35,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [X] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify)*: 11
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: May 2, 2025
Anita P. Wu
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Overhill Farms, Inc. v. Wicked Foods, Inc. a.k.a. Wicked Kitchen Inc., et al. | 25STCV12952 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| Other Personal Injury/ Property Damage/ Wrongful Death | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Overhill Farms, Inc. v. Wicked Foods, Inc. a.k.a. Wicked Kitchen Inc., et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| Other Personal Injury/ Property Damage/ Wrongful Death | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| Contract | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Overhill Farms, Inc. v. Wicked Foods, Inc. a.k.a. Wicked Kitchen Inc., et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☑ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>Number of Parcels ________ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Overhill Farms, Inc. v. Wicked Foods, Inc. a.k.a. Wicked Kitchen Inc., et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| Provisionally Complex Litigation (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| Enforcement of Judgment | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| Miscellaneous Civil Complaints | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| Miscellaneous Civil Petitions | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

| SHORT TITLE | CASE NUMBER |
| --- | --- |
| Overhill Farms, Inc. v. Wicked Foods, Inc. a.k.a. Wicked Kitchen Inc., et al. | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON: ☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | | | ADDRESS: 2727 E. Vernon Avenue |
| --- | --- | --- | --- |
| CITY: Vernon | STATE: CA | ZIP CODE: 90058 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: 5/2/2025

(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

*Superior Court of California, County of Los Angeles*

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.
- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.
- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.
- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**

Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*
  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**

Litigants should closely review the requirements for each program and the types of cases served.

- **Online Dispute Resolution (ODR).** Online Dispute Resolution (ODR) is a free online service provided by the Court to help small claims and unlawful detainer litigants explore settlement options before the hearing date without having to come to court. ODR guides parties through a step-by-step program. After both sides register for ODR, they may request assistance from trained mediators to help them reach a customized agreement. The program creates settlement agreements in the proper form and sends them to the Court for processing. Parties in small claims and unlawful detainer cases must carefully review the notices and other information they receive about ODR requirements that may apply to their case. *For more information, visit https://my.lacourt.org/odr.*

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br>FILED<br>Superior Court of California<br>County of Los Angeles<br>05/05/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. Munoz Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | |
| PLAINTIFF:<br>Overhill Farms, Inc., a Nevada corporation | |
| DEFENDANT:<br>Wicked Foods, Inc.,, et al. | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>25STCV12952 |

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date: 09/08/2025 | Time: 8:30 AM | Dept.: 26 |
|---|---|---|

NOTICE TO DEFENDANT: THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: 05/05/2025

Judicial Officer

Bradley S. Phillips / Judge

**CERTIFICATE OF SERVICE**

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Anita P. Wu
11601 Wilshire Blvd.
Suite 2080
Los Angeles, CA 90025

David W. Slayton, Executive Officer / Clerk of Court

Dated: 05/05/2025

By A. Munoz
Deputy Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>05/05/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. Munoz Deputy |
| PLAINTIFF(S):<br>Overhill Farms, Inc., a Nevada corporation | |
| DEFENDANT(S):<br>Wicked Foods, Inc.,, et al. | |
| **ORDER TO SHOW CAUSE HEARING** | CASE NUMBER:<br>25STCV12952 |

To the party / attorney of record:

You are ordered to appear for an Order to Show Cause Hearing on 09/08/2025 at 8:30 AM in department 26 of this court, Stanley Mosk Courthouse, and show cause why sanctions should not be imposed for:

[✔] Failure to file proof of service.

Failure to comply or appear may result in sanctions pursuant to one or more of the following: California Rules of Court, rule 2.30 and rule 3.1340; Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.310, 583.360, 583.410, 583.420, 583.430; and Government Code section 68608.

[ ] To avoid a mandatory appearance all required documents must be filed at least 5 days prior to the date of the hearing.

Dated: 05/05/2025

Bradley S. Phillips / Judge
Judicial Officer

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br>05/02/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: E. Galicia Deputy |
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | |
| **NOTICE OF CASE ASSIGNMENT**<br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>25STCV12952 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Bradley S. Phillips | 26 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record David W. Slayton, Executive Officer / Clerk of Court

on 05/05/2025 (Date) By E. Galicia, Deputy Clerk

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

**APPLICATION**
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

**COMPLAINTS**
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

**CROSS-COMPLAINTS**
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

**STATUS CONFERENCE**
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

**Class Actions**
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

***Provisionally Complex Cases**
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

REGISTERED AGENT SOLUTIONS INC
A LEXITAS COMPANY

**Registered Agent Solutions, Inc.**
*Corporate Mailing Address*
5301 Southwest Parkway, Suite 400
Austin, TX 78735

**Phone:** (888) 705-7274

# SERVICE OF PROCESS RECEIPT

2025-05-08

Matthew Tulman
**Plant Foods Co. PBC**
0056 Edwards Village Blvd.
Ste. 124 #320
Edwards, CO 81632 USA

## NOTICE OF CONFIDENTIALITY

This notice and the information it contains are intended to be a confidential communication only to the individual and/or entity to whom it is addressed. If you have received this notice in error, immediately call our SOP Department at (888) 705-7274.

## RE: Plant Foods Co. PBC

This receipt is to inform you that Registered Agent Solutions, Inc. has received a Service of Process on behalf of the above-referenced entity as your registered agent and is hereby forwarding the attached document(s) for your immediate review. A Summary of the service is shown below; however, it is important that you review the attached document(s) in their entirety for complete and detailed information.

For additional information and instruction, contact the document issuer: BROWN NERI SMITH & KHAN, LLP

### SERVICE INFORMATION

Service Date: 2025-05-08
Service Time: 9:31 AM EDT
Service Method: Process Server

### RASi REFERENCE INFORMATION

Service No.: 0376071
RASi Office: Delaware
Rec. Int. Id.: EMR

### CASE INFORMATION

Case Number: 25STCV12952
File Date: 05/02/2025
Jurisdiction: SUPERIOR COURT, LOS ANGELES COUNTY, CALIFORNIA
Case Title: OVERHILL FARMS, INC. V. WICKED FOODS, INC., ET AL.

### ANSWER / APPEARANCE INFORMATION

30 days

*(Be sure to review the document(s) for any required response dates)*

### AGENCY / PLAINTIFF INFORMATION

Firm/Issuing Agent: BROWN NERI SMITH & KHAN, LLP
Attorney/Contact: ANITA P. WU
Location: California
Telephone No.: 310-935-3947

### DOCUMENT(S) RECEIVED & ATTACHED

Complaint
Summons
Notice: OF CASE MANAGEMENT CONFERENCE; OF CASE ASSIGNMENT
Order: TO SHOW CAUSE HEARING

### ADDITIONAL NOTES:

**Questions?** Should you have any questions or need additional assistance, please contact the SOP Department at (888) 705-7274.

You have been notified of this Service of Process by Insta-SOP Delivery, a secure email transmission. The transmitted documents have also been uploaded to your Corpliance account. RASi offers additional methods of notification including Telephone Notification and FedEx Delivery. If you would like to update your account's notification preferences, please log into your Corpliance account at www.rasi.com.

*Thank you for your continued business!*